```
                                          FILED
                                    U.S. DISTRICT COURT
                                    DISTRICT OF WYOMING

                                    2014 FEB 19  PM 3 48

                                    STEPHAN HARRIS, CLERK
                                         CHEYENNE
```

James E. Fitzgerald (5-1469)
The Fitzgerald Law Firm
2108 Warren Avenue
Cheyenne, WY 82001
307-634-4000 Telephone
307-635-2391 Facsimile
jim@fitzgeraldlaw.com

Patrick J. Crank (5-2305)
Crank Legal Group, P.C.
1815 Evans Avenue
PO Box 1709
Cheyenne, WY 82003-1709
307-634-2994 Telephone
307-635-7155 Facsimile
pat@cranklegalgroup.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| CINDY KAY MULLEN, Individually, and as Wrongful Death Representative of STEVEN JOHN MULLEN, deceased, | )<br>)<br>) |
| Plaintiff, | ) |
| v. | ) Civil Action No. _14 CV 35-S_ |
| LONG BUILDING TECHNOLOGIES, INC. and LONG BUILDING ENVIRONMENTS, foreign corporations, | )<br>)<br>)<br>) |
| Defendants. | ) |

### COMPLAINT

Plaintiff Cindy Kay Mullen as Wrongful Death Representative alleges:

## JURISDICTION, VENUE AND PARTIES

1. Plaintiff Cindy Kay Mullen ("Plaintiff") is a Wyoming citizen who resides in Laramie, Albany County, Wyoming.

2. The First Judicial District Court, Laramie County, Wyoming appointed plaintiff as Wrongful Death Representative for her husband, Steven John Mullen ("Steve Mullen"). She sues for those entitled to recover wrongful death damages under Wyoming law, including herself.

3. Defendant Long Building Technologies, Inc. and/or a/k/a Long Building Environments ("Long") is/are incorporated in a state other than Wyoming, with its/their principal place of business in Colorado.

4. This Court has jurisdiction under 28 U.S.C. §1332. This is an action between citizens of different states, and the amount in controversy exceeds seventy-five thousand dollars ($75,000.00), exclusive of interest and costs.

5. Venue is appropriate in this District under 28 U.S.C. §1391(a)(2). A substantial part of the matters, events and omissions establishing the claims occurred in this District.

6. The Director of the Wyoming Division of Workers Compensation and the Wyoming Attorney General are being served by certified mail, return receipt requested, with a copy of this complaint under W.S. §27-14-105(b)

## ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

7. The State of Wyoming wanted to remodel its Liquor Division Warehouse at 6601 Campstool Road, Cheyenne, Laramie County, Wyoming. The remodel included, among other things, adding a cooling system.

8. There was an architect (Coates and Associates) a project engineer (MKK Consulting Engineers), a general contractor (FCI Constructors), a plumbing contractor (Town and Country) and a heating, ventilation and air-conditioning (HVAC) contractor, Mullen's Plumbing and Heating of Laramie, Wyoming (Mullen's Plumbing and Heating, or Mullen).

9. Upon information and belief, MKK created drawings and specifications which identified make-up air handling units ("MUA") manufactured by Energy Labs as being necessary for the job. Town and Country, in turn, provided the drawings and specifications to Mullen's Plumbing and Heating so Mullen could bid on the project.

10. Upon information and belief, before submitting a bid for this project, Mullen's Plumbing and Heating contacted several companies that sell MUA units. One of those companies was Long, which specifies, customizes and orders equipment from many manufacturers.

11. Long represents that because it is "[s]taffed by professional engineers that have studied their products and the proper application of equipment and systems extensively, Long Building Environments is able to customize offerings to each customer, building and business." http://www.long.com/sales/

3

12. Long specializes in recommending and ordering equipment for such projects. Long is sophisticated and knowledgeable about such equipment, features and safety options. Using its in-house engineers, Long deals with more than twenty manufacturers and selects products, features and optional equipment from them. The manufacturer provides what Long orders. Upon information and belief, Long was the only entity that could provide MUAs manufactured by Energy Labs for delivery to Wyoming.

13. Project engineers and contractors like Mullen Plumbing and Heating depend on Long to recommend and obtain equipment that is appropriate and safe for a given project, and Mullen and others did so here.

14. Mullen Plumbing and Heating, as customary, forwarded the project engineer's (MKK) specifications and drawings for the MUA to Long.

15. Long, based on its sophistication and knowledge as an Energy Labs supplier, customized an Energy Labs MUA for the warehouse, and quoted a price to Mullen so Mullen could bid. Town and Country accepted Mullen's bid.

16. Mullen Plumbing and Heating did not specify the equipment or select components of the customized cooler.

17. The customized MUA supplied by Long is essentially a large swamp cooler.

18. The MUA consisted of a fan that pulled outside air through a wall of water-soaked mesh that cooled the air. The fan then propelled the cooled air into the warehouse.

19. The MUA had three rooms, shown below in order of the air path. First is the mesh room, second is the intake air room and third is the output air room. Each room had a door

that allowed access only to that particular room. The doors to the intake and output rooms are on the front; the door to the mesh room is on the back.



20. The MUA, as noted, has three doors. The doors on the front allow access to the fan. One door opens to one side of the fan and another door opens to the other side. One cannot get from one room to another without exiting the MUA and entering the other room. On the day of his death, Steve Mullen entered only one room, the intake air room.

21. The first room, the mesh room, has no access to the large fan. Its water-soaked mesh wall separates the first room from the second room, the intake air room. A bulkhead

5

separates the intake air room from the final room, the output air room. One side of the fan is the motor; the other is the inlet. The fan inlet is at the bulkhead separating the intake and output rooms, and near the floor. The fan motor is on the other side of the bulkhead.

22. Long bid, ordered, and supplied the MUA with an "SWSI fan with fan guard." This fan guard is an interlock on the door that shut off the electricity to the fan. However, Long guarded only one side of the fan. When he was killed, Steve Mullen was in the side that lacked the guard. Therefore, the fan still ran when Mr. Mullen was in this side of the MUA.

23. When Long customized the MUA, Long chose not to include two interlocking doors, one for the door that gave access to the intake air room and one for the other door that gave access to the output air room. Energy Labs, the manufacturer, made the MUA accordingly. Energy Labs would have added whatever features or components Long chose, including interlocks on both doors.

24. Long knew the fan was dangerous without a guard, that warnings would not suffice to protect from danger, and that a fan guard by way of interlock was available for both sides of the fan. By adding only one "fan guard by way of the door interlock" and not two such door interlocks, Long allowed access to an operating, unguarded fan.

25. Such fan guards are highly effective because when the door opens, the fan stops.

26. An interlock is essentially an electrical switch that automatically shuts down the fan. To open the door to the motor room, one must pull the bolt from the hole pictured below, which stops the fan.

6



Interlock on the output air room door

27.     The interlock prevented anyone from entering the output air room while the fan motor ran.



Photograph taken from the vantage point of interlocked door into the output air room.



Inside the output air room with the interlocked door.

28. Long exercised its superior knowledge but took only half-measures when it added a fan guard by way of door interlock to the output air room only. It left the equally dangerous intake air room with no fan guard.

29. A fan guard just like the one for the output air room was available from the manufacturer for the intake air room, but Long chose not to include it. As a result, opening the door to the intake air room would not shut down the fan, and did not.

30. The MUA shipped in two halves on a flatbed trailer to the job site. A crane off-loaded them and Mullen installed the MUA in May 2012.

31. Long knew the MUA came in two halves that the installer must join across the

top, down the sides and across the floor. Long knew that as a result, there would be a lip inside and outside all the way around the MUA at the sealed joinder. Long knew the lip was on the floor of the intake air room.

    32.    Long knew that it was foreseeable that persons would trip on this lip.

    33.    Long nevertheless chose not to interlock the door to that room.



34. The sealed joinder of the two halves runs down the middle of the air intake room, as shown above. The fan is to the left of the sealed joinder, opposite the mesh.

35. In June 2012 after installation, state personnel noticed the system was not cooling the building. Two state employees entered the intake air room to look at it. The fan continued to run because there was no interlock. It was thought that the mesh water pump might not be

11

working. Steve Mullen drove to Cheyenne from Laramie on June 13, 2012. He entered the intake air room to check on the GFCI. Again the fan did not stop because Long chose not to interlock the door.

36. Steve Mullen checked the GFCI which, as shown above, was near the floor, so he kneeled. When he stood up to leave the room, he stumbled on the lip, fell toward the unguarded, powerful fan and it sucked him in and killed him.

37. The fan would not have killed Mullen if Long had chosen to guard this side of the fan by way of door interlock, as it had guarded the other side.

38. Long knew that the MUA would require maintenance/repair and knew that users/consumers would or could maintain/repair it as Steve Mullen did on June 13, 2012. His use was reasonably foreseeable.

## CLAIMS FOR RELIEF AGAINST LONG - NEGLIGENCE

39. Plaintiff incorporates by reference all preceding and following paragraphs as if fully set forth in the claims against Long.

40. Long owed duties of reasonable care in the selection and provision of the MUA and its parts.

41. Long breached its duties by, *inter alia,* choosing not to add an interlock to the intake air room door and, as a result, the intake air room had no guard by way of door interlock.

42. As a direct and proximate result, Steve Mullen sustained grievous bodily injuries and died.

## DAMAGES

43.     Steve Mullen's wrongful death left his wife a widow and his son fatherless.

44.     Steven Mullen's wrongful death resulted in damages to those entitled to recover for lost care, comfort and society, past and future; and lost income and benefits, past and future, all in amounts to be determined at trial.

## PRAYER FOR RELIEF

Wherefore, plaintiff prays for judgment against defendants in an amount greatly exceeding seventy-five thousand dollars ($75,000.00) for compensatory damages and interest, costs, disbursements and such other relief as the law may permit.

Dated: February 19, 2014

*James E. Fitzgerald (5-1469)*
James E. Fitzgerald (5-1469)
The Fitzgerald Law Firm
2108 Warren Avenue
Cheyenne, WY 82001
307-634-4000  Telephone
307-635-2391  Facsimile
jim@fitzgeraldlaw.com

-and-

*Patrick J. Crank*
Patrick J. Crank (5-2305)
Crank Legal Group, P.C.
1815 Evans Avenue
PO Box 1709
Cheyenne, WY 82003-1709
307-634-2994  Telephone
307-635-7155  Facsimile
pat@cranklegalgroup.com